**GANNETT CO., INC., Intervenor Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee,**

v.

**Steven B. PENNELL, Defendant Below, Appellee.**

Supreme Court of Delaware.

Submitted: Oct. 31, 1989.
Decided: Nov. 13, 1989.
Written Opinion: Feb. 22, 1990.

Richard G. Elliott, Jr. (argued), David L. Finger, Richards, Layton & Finger, Wilmington, for appellant Gannett Co., Inc.

Gary W. Aber, Heiman, Aber & Goldlust, Wilmington, Jane E. Kirtley, Robert S. Becker, the Reporters Committee for Freedom of the Press, Washington, D.C., Richard M. Schmidt, Jr., Cohn & Marks, Washington, D.C., James Grossberg, Ross, Dixon & Masback, Washington, D.C., Robert J. Brinkmann, National Newspaper Ass'n, Washington, D.C., Bruce Sanford, Douglas E. Lee, Baker & Hostetler, Washington, D.C., for amici curiae the Reporters Committee for Freedom of the Press, American Soc. of Newspaper Editors, Maryland–Delaware–District of Columbia Press Ass'n, and National Newspaper Ass'n & Soc. of Professional Journalists in support of appellant Gannett Co., Inc.

Jeffrey M. Taschner, Dept. of Justice, Wilmington, for appellee the State of Del.

Eugene J. Maurer, Jr., Wilmington, for appellee Steven B. Pennell.

Steven J. Rothschild (argued), Andrew J. Turezyn, Paul L. Regan, Matthew F. Boyer, Skadden, Arps, Slate, Meagher & Flom, Wilmington, for amicus curiae in support of appellees the State of Del. and Steven B. Pennell.

Before CHRISTIE, C.J., MOORE, WALSH and HOLLAND, JJ., and HARTNETT, Vice Chancellor (sitting by designation pursuant to Del. Const. art. IV, § 12), constituting the Court en banc.

MOORE, Justice, for the majority.

We accepted this expedited interlocutory appeal to consider an issue of first impression—whether the news media have a qualified first amendment right to require announcement of jurors' names during a highly publicized first degree murder trial, even though the parties have full access to such information and the proceedings are otherwise open to the public. The Gannett Company ("Gannett"), publisher of the News–Journal, a daily statewide newspaper in Delaware, appeals from a pretrial order (the "Order") of the Superior Court directing the Prothonotary to keep confidential the names of prospective jurors in this case. The jury was not sequestered, and the Order was entered under the authority of a Delaware statute derived from the federal and uniform laws of the United States. The trial court properly concluded that the Order was necessary in light of the intense media coverage of this case, and the unprecedented coverage of individual jurors by Gannett in another recent and notorious murder trial in Delaware.

On appeal, Gannett contends that the Order unconstitutionally restricts its first amendment right of access to judicial proceedings, and violates its constitutional right to a hearing under the fourteenth amendment. We disagree. Applying the

analogous principles of *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 8–9, 106 S.Ct. 2735, 2740–41, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*), we find that no qualified right of access exists here. *See also Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 589, 100 S.Ct. 2814, 2834, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring). *Press–Enterprise II* suggests that a qualified first amendment right of access attaches only if "the particular proceeding passes ... [threshold] tests of experience and logic." *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. at 2740. Gannett's claims fail both these tests. Accordingly, we affirm.

### I.

Steven B. Pennell was charged with three counts of first degree murder in November, 1988.[1] The murders were alleged to be serial killings, and the State sought the death penalty. Autopsies of the three female victims revealed that they had been bound and tortured, their bodies mutilated. Because of the lurid nature of the crimes, the case received widespread publicity in the local and regional media throughout the investigation, pretrial and trial proceedings.[2]

During the spring and summer of 1989, the Superior Court held several pretrial hearings, all of which were open to the public. The trial judge was concerned about the extensive publicity the case was receiving. He began to consider ways to insure that prospective jurors were unbi-ased and that the defendant would receive a fair trial. On July 28, 1989, before the names of prospective jurors had been publicly announced, and before jury selection had begun, the Order was entered, which stated:

> In order to protect the integrity of the jury in this case, I am taking the following steps:
>
> 1. I direct the Prothonotary to keep confidential the names of all jurors subpoenaed for this jury panel. The jury information sheet will be available only to the attorneys for the parties. The names will not be released to anyone else.
>
> 2. On jury selection days those jurors who respond will be assigned a number from 1 to 100. Those numbers will be placed on the juror information sheets delivered to the attorneys and the Court.
>
> 3. All jury selection in open Court will be accomplished by numbers and not by names.

*State v. Pennell,* Del.Super., Cr.A. Nos. IN88–12–0051 to 0053, Gebelein, J. (July 28, 1989) (ORDER).[3]

The Order was issued because of the overwhelming pretrial publicity in this case, and the similarly extraordinary and unprecedented trial publicity Gannett gave unsequestered jurors in the nearly contemporaneous murder trial of Joyce Lynch. *See State v. Joyce L. Lynch,* Del.Super., Cr.A. Nos. IK88–01–0040 to 0047, Ridgely, J., 1989 WL 64149 (June 2, 1989) (ORDER). Lynch and her husband, Richard, were ac-

---

1. When the order announcing our decision was issued on November 13, 1989, Pennell's criminal trial was still in progress. Pennell has since been convicted on two counts of first degree murder. The jury could not reach a verdict on the third count. He has filed an appeal.

2. The trial court compiled a list of thirty-five articles published in the News–Journal, alone, from the date of the indictment on November 30, 1988 to March 4, 1989, near the time of the pretrial suppression hearing. During the trial, which began on September 25, 1989, and ended with guilty verdicts and sentences of life imprisonment, imposed by the jury, on November 28, 1989, Gannett continued its extensive coverage. The case also was reported almost daily on radio and television, frequently with "live" coverage from the courthouse.

3. The parties disagree about the date on which the Order became available to the public. Gannett claims that the Order was not docketed properly until October 5, 1989, the day after its Opening Brief was filed with this Court. The State and Pennell contend that the Order was placed in the publicly accessible file on July 31, 1989, only a few days after it was issued. The docket sheet reflects both possible dates. The Order was apparently not given a docket number until October 4, 1989, but it appears on the docket sheet between items "51" and "53", reflecting a transaction date of July 31, 1989. In any event, Gannett became aware of the Order before jury selection began.

cused of stealing a nine-day old child on Christmas Eve, and killing his parents during the abduction. Joyce Lynch was tried first. During jury selection, the names of prospective jurors were announced in court before individual *voir dire*. At that time the *Lynch* court had no indication that Gannett might publish names and profiles of individual jurors during the trial. Later, the State and counsel for Lynch informed the court that a Gannett reporter was seeking specific information about members of the unsequestered jury. The State and defense counsel feared that publication of jurors' names and addresses would encourage the public to make unsolicited phone calls to individual jurors about the case and might threaten juror impartiality.

After an *in camera* hearing, the *Lynch* court ordered the parties and the press to keep jurors' names confidential. Gannett immediately moved to intervene and to vacate the order, alleging that it was an unconstitutional prior restraint since the jurors' names had already been announced. The trial judge refused to vacate the order as a prior restraint, characterizing it instead as a restrictive order directed to court personnel, but acknowledged the media's right to publish information (the jurors' names) which had already been publicly announced in court. However, the media was urged to consider carefully the "Bar–Bench–Press Declaration of Delaware" which encouraged news representatives to respect the privacy of jurors.

Gannett, nevertheless, immediately published an article in the midst of trial highlighting the names and giving profiles of individual jurors. Apparently, this was the first newspaper article in Delaware to publish such information while a trial was in progress. The article admitted that the "jurors value[d] their privacy highly and became extremely upset when a ... television crew followed some of them to lunch and attempted to film them eating." Fur-

ther, it stated that the jurors "avoid[ed] media, family members of the victims and defendant, and anyone else who appear[ed] recognizable, leaving local restaurants at the sight of a familiar face from the courtroom." The article then continued with detailed profiles of the jurors, giving their names, hometowns, occupations, marital status, number and ages of their children, personal mannerisms and appearance. The latter portrayals were rarely flattering. Jurors were described as having a "stern expression", a "stern demeanor", "stylishly dressed", "admits to a hearing problem", "stout", "mostly bald", "short and round", and "tall, balding and thin".

Recognizing the press' claim of a prior restraint in *Lynch*, the *Pennell* trial judge issued the Order limiting disclosure of the jurors' names to anyone other than the State and defense. It permitted "the Court to proceed with the selection [of jurors] and to allow any interested parties such as the News–Journal to come in and talk about what should be the procedure without first let[ting] the names be disclosed to the public." Proceedings on Motion to Vacate Order, at 22 (Sept. 11, 1989). The trial judge bottomed his ruling on the principle that *voir dire* of the jury is subject "to control ... as a matter of court management." *Id.* at 11.

On September 7, 1989, Gannett moved to intervene and to vacate the Order. The Superior Court heard oral argument on these motions on the morning of September 11. Both the State and Pennell urged the trial court to keep jurors' identities confidential. In an expedited bench ruling, the trial judge refused to vacate his Order. No evidence was presented at this hearing, but before the trial court's written opinion was issued, Gannett submitted certain affidavits. *Voir dire* of potential jurors also began.[4] Jury selection took several days.

In a written opinion, the trial judge again refused to vacate the Order. *State v. Pen-*

---

**4.** During *voir dire,* the trial court asked prospective jurors whether they could perform their duties fairly and impartially if their names were made public. Only five of seventy-six potential jurors stated that they felt they could not be fair to the defendant if their names were publicly announced. Of the jurors selected for the final panel, none believed that they would be improperly influenced by public announcement of their names. However, Gannett acknowledged at the first oral argument that the jurors' views on this subject were not controlling.

*nell,* Del.Super., Cr.A. Nos. IN88–12–0051 to 0053, Gebelein, J., 1989 WL 167445 (Oct. 2, 1989). He cited statutory and judicial authority giving trial judges discretion in such matters. *Id.* at 4 & 10 (citing 10 *Del.C.* § 4513 and Superior Court Jury Plan § 16). *See also Revised Report of the Judicial Conference Committee on the Operation of the Jury Selection on the "Free Press—Fair Trial" Issue,* 87 F.R.D. 518, 529–32 (1980). He also stated that the press had no right to require a trial judge to release jurors' names under Delaware's Freedom of Information Act because records exempted from disclosure by statute (such as 10 *Del.C.* § 4513) are not considered public records. *Id.* at 9.

Finally, the trial court noted that even assuming the decision to withhold jurors' names amounted to a prior restraint, or closure of judicial proceedings under the first amendment, it was justified in withholding the names as the least restrictive alternative to protect the defendant from the "reasonable probability or reasonable likelihood" of prejudice. *Id.* at 14 & 18–25 (citing *State v. Shipley,* Del.Super., 497 A.2d 1052, 1055 (1985)). In applying *Shipley's* "reasonable probability" of prejudice test, the trial court expressly rejected the higher "substantial probability" standard for closure enunciated in *Press–Enterprise II. Id.* at 15 n. 3. It reasoned that *Press–Enterprise II* involved unique facts and trial procedures not present here. *Id.*[5]

On September 18, Gannett appealed. This Court initially ordered Gannett to show cause why it had standing, but later vacated the order because "[t]he Superior Court's order has arguably affected a right within the zone of the media's interests which are protected by the First Amendment." *Gannett Co. v. State,* Del.Supr., 565 A.2d 895, 897 (1989). The appeal was expedited, and because it proceeded simultaneously with Pennell's criminal trial, we appointed an *amicus curiae* to file a brief on behalf of the State and Pennell. The Court expresses its appreciation to the *amicus* for that effort.

On appeal Gannett contends that even though it never was excluded from the courtroom at any stage of the proceedings, including jury *voir dire* and selection, the Order requiring court personnel to keep jurors' names confidential constitutes a partial closure of the trial. Gannett claims to have a qualified first amendment right of access to public announcement of jurors' names based on the threshold tests of experience and logic under *Press–Enterprise II.*

, First, Gannett argues that jurors' names have historically been announced in Delaware courts, and that neither 10 *Del.C.* § 4513 nor the Superior Court Jury Plan are applicable to that historical tradition. Second, it claims that disclosure of jurors' names enhances both the fairness and the appearance of fairness in criminal trials by imposing an added sense of responsibility on jurors and by promoting public confidence in the trial process. Gannett and its *amici curiae* also argue that disclosure and publication of jurors' names provides an additional check against juror bias. Based on this alleged first amendment right, Gannett concludes that the trial court erred in failing to provide notice and to conduct a proper hearing, in refusing to find a substantial threat to a compelling state interest, and in failing to consider "less restrictive" alternatives such as sequestration of the jury.

## II.

The trial court ruled that it had statutory and common law authority to prohibit announcement of jurors' names in court, and that its prohibition did not violate federal or state constitutional principles. We review such legal holdings *de novo. Cavalier Oil Corp. v. Hartnett,* Del.Supr., 564 A.2d 1137, 1141 (1989); *Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del.Supr., 445 A.2d 927, 930–31 (1982). The standard of review is whether the trial court erred in formulating or applying legal precepts. *Rohner v. Niemann,* Del.

---

**5.** Although we consider the standard applied by the trial court to be erroneous, our application of *Press–Enterprise II,* and the analysis thereun-

der, leads us to the same result reached by the Superior Court, albeit on different grounds.

Supr., 380 A.2d 549, 552 (1977). If the trial court's determinations did not violate state law, or federal or state constitutions, we review its decision to prohibit announcement of jurors' names for an abuse of discretion. *Gimbel v. Signal Cos.*, Del. Supr., 316 A.2d 619, 620 (1974).

### A.

Based on the first and fourteenth amendments,[6] Gannett challenges the trial court's inherent and statutory powers to issue the Order. Neither a criminal defendant's sixth amendment right to a public trial, nor an independent state constitutional right to "open" courts is at issue here. The sixth amendment guarantees a criminal defendant the right to a speedy and public trial by an impartial jury. U.S. Const. amend. VI.[7] That right is personal to the accused. The United States Constitution does not expressly guarantee the public a right of access to a criminal trial. *Gannett v. DePasquale*, 443 U.S. 368, 379–80 & 391, 99 S.Ct. 2898, 2905, 2911, 61 L.Ed.2d 608 (1979); *Estes v. Texas*, 381 U.S. 532, 588, 85 S.Ct. 1628, 1662, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring). Similarly, the Delaware Constitution guarantees open courts,[8] but that section, like similar provisions in other state constitutions, does not specify *what* information must be announced at trial. When authorized by statute, or in order to protect a defendant's right to a fair trial, courts may withhold disclosure of certain information without depriving the public of its right to open courts. *See State v. White*, 97 Ariz. 196, 398 P.2d 903, 904 (1965); *Smith v. State*, Del.Supr., 317 A.2d 20, 23–24 (1974); *Johnson v. Simpson*, Ky.App., 433 S.W.2d 644, 646 (1968); *Brown v. State*, 222 Miss. 863, 77 So.2d 694, 696 (1955); *E.W. Scripps Co. v. Fulton*, 100 Ohio App. 157, 125 N.E.2d 896, 899–904, *appeal dism'd*, 164 Ohio St. 261, 130 N.E.2d 701 (1955).

Here, Gannett's claimed right of access to jurors' names rests solely on the first amendment and the Delaware Constitution's guarantee of a free press.[9] *See generally* Annotation, *Propriety of Order Forbidding News Media From Publishing Names and Addresses of Jurors in Criminal Cases*, 36 A.L.R.4th 1126, 1128 (1985) [hereinafter Annotation]. We thus confront the novel issue whether the news media have a qualified first amendment right of access requiring announcement of jurors' names during a criminal trial. No court has yet decided the issue under sim-

---

6. The first amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The first amendment is applicable to the states through the fourteenth amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

7. The sixth amendment provides:
   In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.
   U.S. Const. amend. VI.

8. The Delaware Constitution provides:
   All courts shall be open; and every man for an injury done him in his reputation, person,

movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense; and every action shall be tried in the county in which it shall be commenced, unless when the judges of the court in which the cause is to be tried shall determine that an impartial trial thereof cannot be had in that county. Suits may be brought against the State, according to such regulations as shall be made by law.
   Del. Const. art. I, § 9.

9. The Delaware Constitution provides in part: "The press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity; and any citizen may print on any subject, being responsible for the abuse of that liberty." Del. Const. art. I, § 5. We have previously noted that this provision has the same scope as the federal first amendment. *In re Opinion of the Justices*, Del.Supr., 324 A.2d 211, 213 (1974). For simplicity, we will refer below only to the first amendment.

ilar circumstances, and significantly, it does not fit neatly into any analytical structure previously applied in first amendment cases involving jurors' names. Other cases regarding the media's right of access to jurors' names presented questions of prior restraints on the press, the public's right of access to judicial records, and the actual closure of courtroom proceedings. While those circumstances are not present here, we nonetheless have applied the *Press Enterprise II* test for closure of judicial proceedings as the most closely analogous basis for disposition of the matter. *Cf. In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1331–32 (D.C.Cir. 1985) (applying *Press–Enterprise II*'s threshold test for closure to first amendment claim of access to judicial records).

■ Gannett concedes that no prior restraint is involved, since the jurors' names were never announced. *Compare Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 103 S.Ct. 3524, 77 L.Ed.2d 1284 (Brennan, Circuit Justice 1983) (order which permanently restrained all persons from publishing jurors' names and addresses after their names had been announced in *voir dire* proceedings was a prior restraint). Moreover, the specific information sought, the announcement of jurors' names in court, is not itself a judicial record. *Compare Newsday, Inc. v. Sise*, 71 N.Y.2d 146, 524 N.Y.S.2d 35, 518 N.E.2d 930 (1987), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988) (jurors' names part of judicial records); *Hearst Corp. v. State*, 60 Md.App. 651, 484 A.2d 292 (1984) (jurors' names and addresses part of court's files). Although we see no real distinction between a court's authority over judicial records and its power over the announcement of information contained in those records, we do not decide the case on this ground. *But see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576, 100 S.Ct. 2814, 2827, 65 L.Ed.2d 973 (1980) ("It is not crucial whether we describe this right ... as a 'right of access' or a 'right to gather information'....") (citations omitted); *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1337 (D.C.Cir. 1985) ("The more precise inquiry, however,

is a functional rather than classificational one: whether information *of the sort at issue here*—regardless of its prior or current classification as court records—was traditionally open to public scrutiny.").

Finally, it is inaccurate to describe this as a closure case. The judicial proceedings, including *voir dire*, were never closed to the public, and Gannett has cited no case directly in support of its thesis of closure. The failure of Gannett's position is confirmed by an application of *Press–Enterprise II*.

## B.

Preliminarily, we note the admonitions of the Supreme Court of the United States in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), which has strong parallels to this dispute. *Sheppard* held that the trial judge's failure to protect the defendant from prejudicial publicity, and to control disruptive influences in the courtroom, warranted reversal of a much-publicized murder conviction. Throughout the pretrial and trial proceedings, the trial judge failed to protect the jury from media attention. Regarding that problem, which is relevant here, the Court noted:

> [T]he jurors were thrust into the role of celebrities by the judge's failure to insulate them from reporters and photographers. The numerous pictures of jurors, with their addresses, which appeared in the newspapers before and during the trial itself exposed them to expressions of opinion from both cranks and friends. The fact that anonymous letters had been received by prospective jurors should have made the judge aware that this publicity seriously threatened the jurors' privacy.

*Id.* at 353, 86 S.Ct. at 1517 (citation omitted).

Based on this and other prejudicial influences, the Supreme Court held that the trial court failed to adequately control the proceedings. It specifically noted that trial courts were empowered to control the courtroom and courthouse premises, and to restrict information disseminated by attor-

neys, witnesses, and court officials. *Id.* at 358–59, 86 S.Ct. at 1520. Moreover, *Sheppard* recognized that:

[U]nfair and prejudicial news comment on pending trials has become increasingly prevalent.... Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused.... If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function.

*Id.* at 362–63, 86 S.Ct. at 1522.

■■■ *Sheppard,* therefore, imposed an affirmative duty on trial courts to limit outside influences on juries.[10] *See Hughes v. State,* Del.Supr., 490 A.2d 1034, 1041 (1985) (quoting with approval from same language in *Sheppard*). Based on *Sheppard,* the Order issued here was within the trial court's traditional power over such matters. While *Sheppard* did not specifically involve a first amendment challenge, we nevertheless keep in mind its principles when extensive media activity threatens a party's fundamental right to a fair trial.

### C.

■■■ The first amendment explicitly guarantees public freedom of expression, but the judicially-recognized first amendment right of access to information is not immutable. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 585–86, 100 S.Ct. at 2831–32 (Brennan, J., concurring). The Supreme Court of the United States has recognized an implicit first amendment right of access to criminal trials, *id.* at 580, 100 S.Ct. at 2829; *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 605, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982), to the selection of jurors, *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 508–09, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*), and to certain preliminary hearings, *Press–Enterprise II,* 478 U.S. at 10, 106 S.Ct. at 2741. To our knowledge, however, no court has yet recognized a right of access to jurors' names.

Even when a first amendment right of access exists, it is qualified, and not absolute. *Id.* at 9, 106 S.Ct. at 2740; *Globe Newspaper,* 457 U.S. at 606, 102 S.Ct. at 2619. This qualified right "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia,* 467 U.S. 39, 45, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984). To overcome the presumption of openness once a qualified right of access attaches, a trial court must find that "closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824. Specifically, a court must find that (1) "there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity

---

**10.** The rules of evidence and ethical conduct lend further support to *Sheppard.* The Uniform Rules of Evidence, which have been adopted in Delaware, suggest that the trial court has an affirmative duty to limit outside influences on jurors. Generally, jurors may not testify about the jury's deliberations, but Rule 606 abrogates that general rule whenever a juror testifies as to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Unif.R. Evid. 606. The Model Rules of Professional Conduct, recently adopted in Delaware, similarly prohibit lawyers from publicly disseminating information known or reasonably known to have a substantial likelihood of materially prejudicing a defendant's right to a fair trial. Rule 3.6(a).

that closure would prevent" and (2) "reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Press–Enterprise II,* 478 U.S. at 14, 106 S.Ct. at 2743. *See also Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824; *Richmond Newspapers,* 448 U.S. at 581, 100 S.Ct. at 2829.

■ In a criminal proceeding the proponent of the first amendment claim must satisfy a two-part threshold test. *Press Enterprise II,* 478 U.S. at 8, 106 S.Ct. at 2740. First, it must be demonstrated that "the place and process have historically been open to the press and general public." *Id.* (experience test). Second, it must be shown that "public access plays a significant positive role in the functioning of the particular process in question." *Id.* (logic test). The party alleging the existence of the qualified first amendment right must pass both parts of this threshold test. Only then does a qualified first amendment right attach. *Id.* at 9, 106 S.Ct. at 2740; *Globe Newspaper,* 457 U.S. at 606, 102 S.Ct. at 2619.

Applying those principles here, we find that Gannett does not satisfy either part of the threshold test. Our decision is in accord with other jurisdictions that have recently addressed somewhat similar issues. *United States v. Edwards,* 823 F.2d 111 (5th Cir.1987), *cert. denied sub nom., Times–Picayune Pub. Corp. v. Edwards,* 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988); *United States v. Doherty,* 675 F.Supp. 719 (D.Mass.1987); *Newsday,* 71 N.Y.2d at 153 n. 4, 524 N.Y.S.2d 35, 518 N.Y.S.2d 930. Because we find that no qualified first amendment right of access exists, we need not consider whether the trial court conducted a proper hearing or made the findings mandated by *Press–Enterprise I* after such a qualified right attaches.

### III.

Turning to the so-called experience test, Gannett first must prove that announcement of jurors' names has traditionally been open to the press and general public. Only recently have courts looked to historical experience[11] as an indication of whether a constitutional right of access exists. *Press–Enterprise II,* 478 U.S. at 10–11, 106 S.Ct. at 2741–42; *Press–Enterprise I,* 464 U.S. at 505–08, 104 S.Ct. at 821–23; *Globe Newspaper,* 457 U.S. at 605, 102 S.Ct. at 2619; *Richmond Newspapers,* 448 U.S. at 564–69, 100 S.Ct. at 2820–23; *Id.* at 589–93, 100 S.Ct. at 2834–35 (Brennan, J., concurring). *See also DePasquale,* 443 U.S. at 384–91, 99 S.Ct. at 2907–11 (evaluating historical right of access to open trials under the sixth amendment).

> [T]he case for a [constitutional] right of access has special force when drawn from an enduring and vital tradition of public entree to particular proceedings or information. Such a tradition commands respect in part because the Constitution carries the gloss of history. More importantly, a tradition of accessibility implies the favorable judgment of experience.

*Richmond Newspapers,* 448 U.S. at 589, 100 S.Ct. at 2834. (Brennan, J., concurring) *See also Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. at 2740; *Globe Newspaper,* 457 U.S. at 605, 102 S.Ct. at 2619.

The Supreme Court of the United States has drawn from many sources to determine the national tradition respecting rights of access. These include English and American commentators on the common-law as it existed when the Constitution was adopted and ratified, *Press–Enterprise I,* 464 U.S. at 506–07, 104 S.Ct. at 822; *Richmond Newspapers,* 448 U.S. at 565–67, 100 S.Ct. at 2821–22; *id.* at 589–90, 100 S.Ct. at 2834 (Brennan, J., concurring); *DePasquale,* 443 U.S. at 389, 99 S.Ct. at 2910; contemporaneous provisions of state constitutions and

---

**11.** The Supreme Court's decisions refer to experience and tradition interchangeably in this context. *Press Enterprise II,* 478 U.S. at 8–10, 106 S.Ct. at 2740–41; *Richmond Newspapers,* 448 U.S. at 589–93, 100 S.Ct. at 2834–36 (Brennan, J., concurring). In our opinion, the crucial inquiry is whether the public has some expectation of a right of access. Whether that expectation derives from years of experience dating back to adoption or ratification of the Constitution or from a more recent tradition is inconsequential, so long as it is the type of experience or tradition that should be incorporated into the Constitution.

statutes, and contemporaneous state judicial decisions, *Press–Enterprise II*, 478 U.S. at 10, 106 S.Ct. at 2741; *Press–Enterprise I*, 464 U.S. at 508, 104 S.Ct. at 823; *Richmond Newspapers*, 448 U.S. at 567–68, 100 S.Ct. at 2822–23; *id.* at 590, 100 S.Ct. at 2834 (Brennan, J., concurring); *DePasquale*, 443 U.S. at 386 n. 15, 99 S.Ct. at 2908 n. 15; and current state statutes indicating the public's common understanding of the historical experience and tradition, *Press–Enterprise II*, 478 U.S. at 11 & 11 n. 4, 106 S.Ct. at 2742 & 2742 n. 4; *DePasquale*, 443 U.S. at 388 n. 19 & 391 n. 23, 99 S.Ct. at 2910 n. 19 & 2911 n. 23.

Gannett contends that the names of jurors have traditionally been announced in court. It claims that the procedure for jury selection under old English common law required jurors' names to be called out in court, but Gannett primarily focuses and relies on the historical practice in Delaware. It argues that the Delaware practice, as reported in the earliest recorded cases and in an early treatise on Delaware procedure, has been to announce the names of prospective jurors in court after the jury is empaneled. Based on these sources, Gannett contends that the practice in Delaware satisfies *Press–Enterprise II's* threshold test of experience. We disagree.

■ Gannett's rather myopic focus on the historical courtroom practice in Delaware is too narrow to establish a national constitutional right. If a qualified first amendment right of access to jurors' names exists, it must be drawn from the broad spectrum of sources cited above. Under Gannett's thesis we would be required to recognize a first amendment right in Delaware, even if its historical practice differed from that of all other states.[12] Whenever the Supreme Court has considered whether the public has a first amendment right of access to a proceeding, it has relied on the national tradition and experience. *Press–Enterprise II*, 478 U.S. at 10 & 10 n. 3, 106 S.Ct. at 2741 & 2741 n. 3 (noting the common practice of open preliminary hearings in many states); *Richmond Newspapers*, 448 U.S. at 567–68, 100 S.Ct. at 2822–23 (discussing common experience of open trials in several states); *DePasquale*, 443 U.S. at 388 n. 19, 99 S.Ct. at 2910 n. 19 (reviewing diverse state traditions regarding public attendance at criminal trials).

■ More importantly, Gannett's historical sources are incomplete and inadequate. Gannett cites Blackstone's *Commentaries* as evidence of the tradition of announcing jurors' names in court. 3 W.

**12.** At oral argument, Gannett's views on this were murky at best:

Justice Moore: Now you say that it's this historic aspect. By what historic standard are you judging that, Delaware or nationally?

Mr. Elliott: Delaware.

Justice Moore: Well, does that then mean that the first amendment might be different in Delaware from a neighboring state?

Mr. Elliott: I don't necessarily believe that. I think you have to look at the historic practice and what has taken place in this state.

Justice Moore: Well does—then, doesn't that mean that the first amendment could be fifty different things?

Mr. Elliott: I think that the answer to that question is that it would be the same in all states.

Justice Moore: Well, how do you know that? Suppose for example—how do you know that?

Mr. Elliott: Because the Supreme Court in *Press–Enterprise* dealt with a proceeding in California and adopted a test, and that test is applicable to—

Justice Moore: I understand that it's applicable, but you say we're going to look at Delaware

history. Suppose Delaware in the last ten years had had a policy of not disclosing jurors' names, but the forty-nine other states all did. So Delaware's first amendment rule would be different from the other forty-nine states?

Mr. Elliott: No, I don't believe it would be.

Justice Moore: Well, then, how do you square that with what you just told me?

Mr. Elliott: Because you have to look at—you look at the history but you also look at the purpose behind the proceeding.

Justice Moore: Well, where do you look? Do you look in Delaware? You said Delaware, in Delaware history, and that raises the question is there to be a potential for fifty different first amendment rules?

Mr. Elliott: I don't believe there is.

Justice Moore: Well, then why would you look only at Delaware?

Mr. Elliott: Well, I think you'd want to look at our practice. You could look at practices in other jurisdictions, but I think what's really, specifically relevant to this Court is the Delaware practice.

Blackstone, *Commentaries on the Laws of England* 358 (1769) [hereinafter *Commentaries*]. It also refers to two Delaware cases with oblique references to the "naming" of jurors, *Wilds v. Green*, Del.Supr., 2 Del.Cas. 292, 295 (1817); *State v. Turner*, Del.Supr., 1 Del.Cas. 94, 95 (1796), and to Wooley's treatise on Delaware procedure, Wooley, *Practice in Civil Actions* §§ 640 & 657 (1906).[13]

Gannett's sources do not support its conclusion. The passage cited from Blackstone's *Commentaries* describes the process of empanelling the jury based on a *statutory* provision:

A common jury is one returned by the sheriff *according to the direction of the statute* 3 Geo. II c. 25 ... and when each cause is called, twelve of these persons, whose names shall first be drawn out of the box, shall be sworn upon the jury, unless absent, challenged, or excused....

As the jurors appear, when called, they shall be sworn, unless *challenged* by either party.

*Commentaries* at 358 (emphasis added). Whether jurors' names were announced out loud appears insignificant to Blackstone. Instead, he relies upon the process of challenging jurors for cause to insure the fairness of the trial:

We may here again observe, and observing we cannot but admire, how scrupulously delicate, and how impartially just, the law of England approves itself, in the constitution and frame of a tribunal.... 1. In the avoiding of frauds and secret management, by electing the twelve jurors out of the whole panel by lot. 2. In its caution against partiality and bias, by quashing the whole panel or array, if the officer returning is suspected to be other than indifferent; and repelling particular

jurors, if probable cause be shown of malice or favour to either party.

*Id.* at 365. Indeed, in *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), the Supreme Court of the United States stated that *voir dire* is "the method we have relied on since the beginning" to identify bias. *Id.* at 1038, 104 S.Ct. at 2892 (citing *United States v. Aaron Burr*, 25 F.Cas. 49, 51 (C.C.D.Va.1807) (No. 14,692g) (Marshall, C.J.).

Similarly, the Delaware cases and Wooley's treatise do not support the position that announcement of jurors' names is constitutionally required. Merely because an historic procedure exists, does not automatically enlarge it to constitutional proportions. As the United States Court of Appeals for the District of Columbia stated: "[I]t is risky ... to assume that a practice of granting access where no objection is made establishes the existence of an acknowledged *right* to access." *In re Reporters*, 773 F.2d at 1336.

Gannett's historical sources do not mention whether the decision to announce jurors' names is within the trial court's traditional authority to control courtroom proceedings. *Cf. Press–Enterprise I*, 464 U.S. at 512, 104 S.Ct. at 825; *Sheppard v. Maxwell*, 384 U.S. at 358, 86 S.Ct. at 1520. Its sources hardly support the type of strong national tradition recognized in other right of access cases. *Compare Press–Enterprise II*, 478 U.S. at 10, 106 S.Ct. at 2741 (preliminary hearings); *Press–Enterprise I*, 464 U.S. at 505–08, 104 S.Ct. at 821–23 (jury selection proceedings); *Richmond Newspapers*, 448 U.S. at 564–69, 100 S.Ct. at 2820–23 (criminal trials) *with DePasquale*, 443 U.S. at 387–91, 99 S.Ct. at 2909–11 (no sixth amendment right to attend pretrial suppression hearings); *In re Re-*

---

**13.** While Wooley was an important guide to Delaware practice in the days of old common law pleadings, its vestigial significance to modern Delaware practice relates to executions upon judgments, mortgage foreclosures, and the extraordinary writs of certiorari, mandamus, prohibition, and quo warranto, none of which have anything to do with jury selection. Until 1948, when Delaware adopted new rules based on the Federal Rules of Civil and Criminal Pro-

cedure, Delaware courts still functioned under the Statutes of 27 Eliz. ch. 5 and 4 Anne ch. 16. It has been observed that in throwing off the "shackles of medieval scholasticism" in 1948, "[n]o other American jurisdiction, contemplating procedural change, could possibly have [had] farther to go." Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 337 n. 16 (1956).

*porters,* 773 F.2d at 1336 ("[W]e cannot discern an historic practice of such clarity, generality and duration as to justify the pronouncement of a *constitutional rule. . . .*"). Indeed other courts have noted that the theory of the jury at common law supports an historical tradition of judicial discretion as to disclosure of juror names.

The virtue of the jury system lies in the random summoning from the community of twelve "indifferent" persons— "not appointed till the hour of trial"—to decide a dispute, and in their subsequent, unencumbered return to their normal pursuits. The lack of continuity in their service tends to insulate jurors from recrimination for their decisions and to prevent the occasional mistake of one panel from being perpetuated in future deliberations. Because the system contemplates that jurors will inconspicuously fade back into the community once their tenure is completed, anonymity would seem entirely consistent with, rather than anathema to, the jury concept.

*United States v. Scarfo,* 850 F.2d 1015, 1023 (3rd Cir.) (citation to Blackstone's *Commentaries* omitted), *cert. denied,* —— U.S. ——, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). *See also Newsday,* 71 N.Y.2d at 153 n. 4, 524 N.Y.S.2d 35, 518 N.E.2d 930.

Paramount in any historical analysis is the fact that trial courts in Delaware and other states have long had specific statutory discretion over the release of jurors' names.[14] Indeed, Blackstone recognized the importance of statutory procedures when he noted that "[a] common jury is one returned by the sheriff *according to the discretion of the statute. . . .*" *Commentaries,* at 358 (emphasis added). Thus, we turn to a comprehensive analysis of the statutory history, which was not provided to us by any of the parties.

In 1968, the United States Congress enacted the Federal Jury Selection and Service Act. 28 U.S.C. § 1861 *et seq.* Among its provisions is the following:

*Plan for random jury selection*

(a) Each United States district court shall devise and place into operation a written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862 of this title, and that shall otherwise comply with the provisions of this title. . . .

(b) Among other things, such plan shall. . . .

(7) fix the time when the names drawn from the qualified jury wheel shall be disclosed to parties and to the public. *If the plan permits these names to be made public, it may nevertheless permit the chief judge of the district court, or such other district court judge as the plan may provide, to keep these names confidential in any case where the interests of justice so require.*

28 U.S.C. § 1863(b)(7) (emphasis added). The Federal Act's legislative history provides some additional insight into the historical discretion traditionally afforded trial courts in connection with disclosing jurors' names. Congress noted that the statute "permits the present diversity of practice to continue. Some district courts keep juror names confidential for fear of jury tampering. Other district courts routinely publicize the names." H.R.Rep. No. 1076, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News 1792, 1801. Indeed, prior to adoption of the current statute, federal law left the manner of empanelling jurors to local rules of court modelled after diverse state statutes. *United States v. Antz,* 16 F. 119, 125 (C.C.E.D.La. 1883). *See also State v. Felts,* 133 F. 85, 92 (C.C.W.D.Va.1904); *United States v. Breese,* 172 F. 765, 768 (W.D.N.C.1909).

In 1975, the United States Supreme Court issued its opinion in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) strongly endorsing both the policy and statutory "machinery" of the recently-enacted Federal Jury Selection

---

**14.** It also has been suggested that trial courts have always retained inherent power to control the release of jurors' names, even in the absence of a statute. If that is so, and we think it is, then this only further undercuts any notion of an historic practice of constitutional proportions, and buttresses the opposite conclusion.

and Service Act. *Id.* at 529, 95 S.Ct. at 697. Less than six months later, based on language *virtually identical* to that found in the federal law [28 U.S.C. § 1863(b)(7)], our General Assembly passed a statute authorizing the Superior Court to adopt a written plan for random selection of grand and petit juries. 60 Del.Laws ch. 225 § 4504 (1975). Like the Federal Act, that statute specifically authorized judges to keep jurors' names confidential:

(a) The Superior Court shall devise and place into operation a written plan for random selection of grand and petit jurors....

(b) Among other things, such plan shall:

. . . .

(7) fix the time when the names drawn from the qualified jury wheel shall be disclosed to the parties and to the public. *If the plan permits these names to be made public, it may nevertheless permit the President Judge of the Superior Court, or such other superior court judge as the plan may provide, to keep these names confidential in any case where the interests of justice so require.*

60 Del.Laws ch. 225 § 4504(b)(7) (emphasis added).

Pursuant to this statute, in 1976 the Superior Court adopted its plan for random jury selection in New Castle County. That plan, which remains in force today, specifically provides:

Section 16. *Disclosure of Information About Jurors.* The names of qualified jurors drawn from the qualified jury wheel shall be made available to the public upon request *unless the court determines in any instance that this information in the interest of justice should be kept confidential or its use limited in whole or in part.*

Plan of the Superior Court of Delaware For the Random Selection of Grand and Petit Jurors, § 16 (effective Sept. 13, 1976) (emphasis added) [hereinafter Jury Selection Plan]. This has been part of the fabric of our law for over 13 years.

In 1987 the General Assembly reiterated the concept of judicial discretion over release of jurors' names by codifying it in Delaware's Jury Selection and Service Act. 66 Del.Laws ch. 5, § 1. Section 4513 provides:

The names of persons summoned for jury service shall be disclosed to the public and the contents of jury qualification forms completed by them shall be made available to the parties *unless the Court determines that any or all of this information should be kept confidential or its use limited in whole or in part in any case or cases.*

10 *Del.C.* § 4513 (emphasis added). Significantly, all parties have failed to note that this provision was modeled on virtually identical language contained in the Uniform Jury Selection and Service Act, promulgated by the National Conference of Commissioners on Uniform State Laws in 1970 and approved by the American Bar Association in 1972. It states:

The names of qualified jurors drawn from the qualified jury wheel and the contents of jury qualification forms completed by those jurors shall be made available to the public *unless the court determines in any instance that this information in the interest of justice should be kept confidential or its use limited in whole or in part.*

Uniform Jury Selection and Service Act, 13 U.L.A. 437, 454–55 (West 1986) (emphasis added). Currently, eleven states,[15] including Delaware, have adopted nearly identical provisions granting trial courts discretion over public dissemination of jurors' names. Colo.Rev.Stat. 13–71–110(5); 10 *Del.C.* § 4513; Haw.Rev.Stat. § 612–18 & 27; Id.Code § 2–210(5); Ind.Code Ann. 33–4–5.5–12(6); Md.Cts. & Jud.Proc.Code Ann. § 8–202(3); 14 Me.Rev.Stat.Ann. § 1254–A; Minn.Stat.Ann. § 593.42 subd. 5; Miss. Code Ann. § 13–5–32; N.D.Code 27–09.1–09; Utah Code Ann. 78–46–13(5).

These statutes give trial courts broad discretion over release of jurors' names.

---

**15.** Eight of these jurisdictions, Colorado, Hawaii, Idaho, Indiana, Maine, Minnesota, Mississippi, and North Dakota, have adopted the Uniform Jury Selection and Service Act in its entirety. 13 U.L.A. at 437.

Specifically, they authorize courts to keep jurors' names confidential in the interest of justice and to limit such use *in any case in whole or in part.* That language is virtually identical to Delaware's present statute and jury plan. Thus, the trial court's Order, directing court personnel to keep jurors' names confidential, is totally consistent with such statutory authority and the clear national and local history it represents. Whatever practice may exist in cases where no media attention is focused on the jury, our statute, with its surrounding history, is a clear statement of public policy that subordinates any general procedure to its specific mandate and purpose.

Gannett contends that the current Delaware statute is inapplicable for two reasons. First, it is claimed that the phrase "summoned for jury service" restricts the exercise of judicial discretion to control over the list of jurors who are sent jury summons. That argument places an artificial limitation on the trial court's discretion based on a tortuous interpretation of the word "summoned". When a juror is called to the jury box, he remains summoned for jury service. Second, Gannett claims the trial court lacks discretion over announcement of the jurors' names because the discretionary language is applicable only to public dissemination of the juror qualification forms. We reject that claim because it is inconsistent with the plain language of the statute. Neither the Delaware statute nor the Uniform Act appears to limit the trial courts' discretion to juror qualification forms,[16] and we refuse to adopt such a strained construction based on an unsupported inference of legislative intent.

Gannett's interpretation of the statute clearly ignores the powers conferred upon the Superior Court to keep jurors' names confidential "in any instance", or their use

"limited in whole or in part." We consider the former phrase to be synonymous with that in the uniform law—"in any case or cases"—while the latter, obviously, is identical. Generally, Delaware jurors are "summoned", not for a particular case, but as part of a panel from which numerous juries may be drawn for a wide variety of civil and criminal trials. If the court's powers were limited, as Gannett argues, only to this group, then the statutory language to which we have referred would be meaningless.

Given the overwhelming statutory history,[17] we must reject Gannett's claim that the historical practice in the nation, or in Delaware, requires announcement of jurors' names. The historical sources do not support Gannett's conclusion. Rather, the historical tradition gives trial courts discretion over such matters, which is reflected in express statutory provisions enacted by duly elected representatives of the people at the state and national levels. The Supreme Court has repeatedly referred to such enactments as additional evidence of a public tradition in constitutional right of access cases. Any general practice upon which Gannett relies, completely ignoring the broad national basis of our law, is, and must be, subordinate to statutory provisions clearly and validly expressing the public will.

Thus, Gannett has failed to carry its burden of establishing any historical tradition of constitutional dimension regarding public access to jurors' names. While this should end the matter, we nonetheless analyze the remaining aspects of the *Press–Enterprise II* test in view of the novelty of the issues and for future guidance of trial courts in applying the proper standards.

---

**16.** Gannett's restrictive interpretation of the statute requires the insertion of a comma after the first clause ("The names of prospective jurors shall be disclosed to the public") to separate it from the discretionary language ("unless the Court determines that...."). If the legislature had intended to separate the clauses, it could easily have done so.

We note that Gannett also cites a Delaware statute, 10 *Del.C.* § 4518, in support of its con-

tention that jurors' names have historically been announced in court. That statute did not specifically require that jurors names be announced in court. In any event, it was repealed in 1975. 60 Del.Laws, c. 225, § 2.

**17.** Again, we note that neither Gannett nor any other party to this appeal cited this complete statutory history to us.

## IV.

The second part of *Press–Enterprise II's* threshold test is whether public access to jurors' names plays a *significant positive role* in the trial or selection of the jury. This "logic" criterion requires us to examine whether "the historical practice play[s] 'an essential role' in the proper functioning of government ... since otherwise the most trivial and unimportant historical practices ... would be chiselled in constitutional stone." *In re Reporters*, 773 F.2d at 1332. For example, in *Press–Enterprise II*, the preliminary hearing in California was found to be "often the final and most important step in the criminal proceeding." 478 U.S. at 12, 106 S.Ct. at 2742. Similarly, *Richmond Newspapers* noted that openness was an *indispensable* attribute of criminal trials. 448 U.S. at 569, 100 S.Ct. at 2823. By contrast, then-Judge Scalia described as trivial the practice of reading judgments aloud in open court. *In re Reporters*, 773 F.2d at 1332. *Cf. Williams v. Florida*, 399 U.S. 78, 102, 90 S.Ct. 1893, 1907, 26 L.Ed.2d 446 (1970) (jury of twelve viewed as historical accident, unnecessary to effect purposes of jury system). When applied to the historical experience, therefore, the logic test helps "to distinguish between what the Constitution permits and what it requires." *DePasquale*, 443 U.S. at 385, 99 S.Ct. at 2908.

At oral argument, Gannett claimed that announcement of juror names was the most important element of jury selection.[18] It contends that announcement of prospective jurors' names promotes both fairness and the appearance of fairness. Allegedly, it encourages fairness by allowing the public to serve as a further check on the possibility that a juror may have some undisclosed bias, which publication of his or her name may ultimately reveal. Gannett and *amici curiae* also maintain that announcement of jurors' names promotes the appearance of fairness by enhancing public trust in the criminal justice system through open criminal proceedings.

By way of background, the fairness of jury selection in Delaware is adequately safeguarded in several respects. First, a panel of prospective jurors is randomly selected from lists of registered voters, supplemented with names from other sources. 10 *Del.C.* §§ 4507(a)(2), 4510; Jury Selection Plan §§ 5–8, 13 & 15. That group is initially screened when they complete juror qualification forms which request basic information such as name, address, and occupation.[19] A second screening occurs during *voir dire*, when the trial court asks the jurors specific questions, prepared by the Court and counsel, to determine which jurors should be dismissed for cause. 10 *Del.C.* § 4511(a). *See also Hughes*, 490 A.2d at 1041 ("[T]he most effective and perhaps most critical" procedural safeguard available to protect and maintain juror impartiality in a highly publicized murder trial "is the careful use of *voir dire*."). Finally, jurors undergo a third screening when counsel exercise peremptory challenges without regard to cause.

▇▇▇ Counsel in *Pennell* were given the jurors' names and other information contained on the qualification forms. The prospective jurors were subjected to the screening procedures described above, which in this case were more intense than usual. Under these circumstances, announcement of the jurors' names is insignificant. "[T]he public interest in the administration of justice is protected by the participants in the litigation." *DePasquale*, 443 U.S. at 383, 99 S.Ct. at 2907. Moreover, the proceedings were not closed.

---

**18.** The following colloquy occurred:

Justice Moore: [The juror's identity] means more than knowing whether the juror is related to a person in the prosecution, whether the person has any views for or against capital punishment? That name is more important than those issues?

Mr. Elliott: I think it is very important.

Justice Moore: Is it more important than those issues?

Mr. Elliott: I think yes.

**19.** The Delaware statute and the Jury Selection Plan both describe information which requires the dismissal of prospective jurors from a jury panel. 10 *Del.C.* § 4509(b); Jury Selection Plan § 10. Among other things, jurors will be automatically disqualified if they do not read or speak English, are mentally or physically infirm, or have been convicted of a felony.

The public, including the press, attended and observed jury selection. Gannett's fairness argument is based on the presumption that jurors will not respond truthfully, and therefore, the public requires a further safeguard, which it is claimed only the press can provide. We refuse to adopt such a cynical view of the criminal justice system. The courts, the State and the defendant have concurrent paramount concerns for, and obligations to assure, a fair trial. This includes a proper solicitude for the jury so that it is not subject to the extraneous influences of a media representative which is also engaged in the business of selling newspapers.[20]  *See also Sheppard*, 384 U.S. at 353, 86 S.Ct. at 1517.

Gannett's argument, that announcement of jurors' names promotes fairness, confuses the defendant's rights under the sixth amendment with the public's rights under the first amendment. The press cannot rely on the sixth amendment's guarantee of a fair trial to the defendant, particularly when courts have determined that criminal defendants may have a fair trial even without knowing jurors' names. *United States v. Tutino*, 883 F.2d 1125 (2d Cir.1989); *Scarfo*, 850 F.2d at 1021–23. *See also*, Note, *Anonymous Juries*, 54 Fordham L.Rev. 981 (1986). *Cf. United States v. Edmond*, 886 F.2d 442 (D.C.Cir.1989). Courts have repeatedly upheld the use of anonymous juries against defendants' sixth amendment challenges based on fair trial rights. We see no reason to afford the media greater rights of access to jurors' names than the Constitution permits the parties to a trial. As the United States Court of Appeals for the Second Circuit has ruled:

> What we are confronted with, then, is a *voir dire* procedure under which both the prosecutor and defense were equally in the dark as to names and addresses of the prospective panelists, and where neither side was told the exact ethnic background or religion of those persons. Both sides, however, had an arsenal of information about each person that was based on his responses to questions concerning his own life, as well as his attitudes about the issues that would arise in the case. This can hardly be deemed "inadequate". The law as to jury selection is not so unbending that it cannot, or should not, be accommodated to the realities of modern day trials.... Clarence Darrow's ideal has already yielded to what has been thought to be the greater necessity, i.e., the need to streamline the *voir dire* process by resting the control of it in the district judge, subject to demand that the essentials of the case should be the subject of inquiry. If that demand is satisfied, then so will have been the rights of the parties.

*United States v. Barnes*, 604 F.2d 121, 142–43 (2d Cir.1979) (citation and footnote omitted). The defendant clearly has an equal, if not greater, interest than the media in receiving a fair trial. Gannett's attempt to distinguish these cases on factual grounds misses that vital point.

While there may be the rare case in which some salutary effect upon the jury selection process occurs by reason of the press' access to jurors' names, we consider that remote under these circumstances. The persons most directly involved—the trial judge, the defendant, and the State—were provided with the jurors' names and other information. We cannot say that the appearance of fairness would have been significantly enhanced by announcement of jurors' names in such a highly publicized setting. The trial court had a justified concern that the fairness of jury selection in the *Pennell* trial was endangered, not enhanced, by the extensive publicity Gannett had just recently focused upon the *Lynch* jury.

Gannett's sweeping claim that announcement of jurors' names promotes the appearance of fairness is a characteristic overstatement of the issue, and not without irony. All aspects of the trial were entirely open to the public. Except for space limitations, no one was denied access to the

---

**20.** *We also observe that the National Center for State Courts is now preparing a manual on managing notorious cases, including issues of* jury selection, jury security, and media and trial management. 17 Report of National Center for State Courts, back cover (Jan.1990).

courtroom. Given the extraordinary publicity which Gannett itself had so recently fueled by the attention it gave the *Lynch* jury, it is perhaps more accurate to say that had the *Pennell* jurors' names been announced in court, the public perception would have been one of concern for the jurors and the extraneous influences upon them which Gannett's publicity invited. *See Sheppard*, 384 U.S. at 353, 86 S.Ct. at 1517 (jurors exposed "to expressions of opinion from both cranks and friends"). The trial court's Order assured the public that the trial was fair without closing the proceedings to anyone. Contrary to the rather pietistic claims of Gannett and its *amici curiae*, there is nothing to suggest that such actions undermined public trust in the judicial system.

Thus, Gannett fails the logic part of *Press Enterprise II's* threshold test. Announcement of jurors' names in court promotes neither the fairness nor the perception of fairness, when the parties are provided with the jurors' names and all proceedings are open to the public. It strains credulity to suggest that such an announcement was essential to the proper functioning of the trial. Having failed both parts of the *Press–Enterprise II* test, Gannett clearly has no qualified right of access to the jurors' names.

## V.

■ Since Gannett has not shown that a qualified first amendment right of access exists, the failure of the trial court to conduct an evidentiary hearing, or to apply *Press–Enterprise II's* substantial probability test, does not, under these circumstances, mandate reversal. In the absence of a qualified first amendment right of access, the trial court's decision to order court personnel to keep jurors' names confidential was within its discretion. We find no abuse of that discretion.[21]

The trial court has an affirmative duty to control all aspects of pretrial and trial proceedings. The very recent prior media coverage of jurors in the *Lynch* trial created legitimate concerns that jurors in *Pennell* might be improperly influenced by extraneous factors or sources sufficient to endanger the defendant's right to a fair trial. The Order responded to those concerns in a reasonable manner without imposing the more onerous strictures of sequestration or closure of the courtroom. The judgment of the Superior Court is AFFIRMED.

WALSH, Justice, dissenting, with whom CHRISTIE, Chief Justice joins:

The majority today holds that a court may deny the public and the press access to the names of jurors impanelled in a criminal trial, as a matter of discretion, without balancing the public's right of access against the threat to a defendant's Sixth Amendment right to a fair trial. The United States Supreme Court has recognized that the public's right of access to judicial proceedings is protected by the First Amendment to the United States Constitution.[1] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*); *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*). I believe that these precedents compel us to conclude that the public has a qualified First Amendment right to know the identity of those who determine the guilt and innocence of criminal defendants. In my view, the reasons cited by the trial judge for restricting that right in this case are insufficient to overcome this

---

**21.** We observe, however, that one of the problems which the trial judge could have avoided was the *sua sponte* exercise of his discretion without first notifying the State and defendant of his intended action. That issue was mooted by the hearing held after Gannett intervened. The better course in the future would be for the

trial judge to exercise his discretion on such an important matter only after giving the State and defendant an opportunity to be heard.

**1.** "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend. I.

presumption of openness. Moreover, as the majority acknowledges, the trial court entered its order denying access without conducting an evidentiary hearing and without applying the substantial probability test mandated by *Press–Enterprise II.* Accordingly, I dissent.

I

The majority has recounted the history of this case in the Superior Court, but certain aspects of the proceedings bear particular emphasis in examining the First Amendment question. First, although I do not fault the trial judge's concern over the extreme publicity that this case received at the pretrial stage, it must be noted that the initial closure order was entered *sua sponte* and without prior notice to the State or the defendant. The public in general as well as the press did not become aware of the closure order until two months later. Second, the trial judge based his denial of access ruling on two considerations: juror taint through publicity, with its consequent effect on the defendant's right to a fair trial, and juror privacy.[2] The majority, however, has chosen not to rely on the juror privacy rationale, upholding denial of access on the sole ground that "intense media coverage" would affect the jury's deliberations. Nevertheless, in focusing on the *Lynch* trial as a justification for closure, both the trial judge and the majority have, in effect, provided a juror privacy rationale as the basis for protecting Pennell's Sixth Amendment rights. It is important at the outset therefore to address the significance of Gannett's conduct during the *Lynch* trial.

During the murder trial of Joyce Lynch in mid–1989, Gannett published an article that included the names and physical descriptions of the impanelled jurors. *The 12 Who Will Deliver Lynch Verdict,* The News Journal, June 3, 1989, at A9, col. 1. I have no quarrel with the majority's view that Gannett's profile of the *Lynch* jurors constitutes journalism of questionable qual-

ity. The article tends to trivialize jury service, focusing primarily on the age, physical characteristics, and family size of the jurors. I also harbor no illusions about the motives of the communication media in reporting events in the criminal trial process. The media are engaged in a competitive commercial enterprise where success is measured in terms of circulation and ratings. But judges are not journalism critics entitled to bring to the constitutional debate over freedom of the press our distaste, whether justified or not, for certain journalistic practices. One could well imagine a juror profile article that sought to remind the public of the importance of jury service or helped the public to understand the trial strategies that led to the acceptance or rejection of certain jurors. On a more controversial level, one could even imagine an article that questioned whether a given jury was truly representative or that challenged the qualifications of certain jurors, thereby invoking public debate on the system of jury selection. Had Gannett published any of these articles, I doubt that the trial judge would have taken it upon himself to limit public access to the *Pennell* trial. Unfortunately, because Gannett printed a distasteful article offensive to individual jurors in a prior case, our courts have approved a method to prevent Gannett or anyone else from printing *any* article on the subject of personalized juror selection in the *Pennell* case. Thus, I fear that the majority's substantial reliance on the *Lynch* article constitutes a subtle yet troubling intrusion into the editorial policies of the press.

*Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), upon which the majority also relies, suggests that even where the press has reported upon a trial in a highly irresponsible manner, the courts should act to limit the effects of publicity on the trial rather than limiting the press' access or attempting to influence the content of what is published. Under the majority's view, however, a court may examine the editorial policies of

2. The trial judge was also influenced by a third concern: the need to encourage juror participation. This concern, however, would appear to be immersed in, and result from, the promotion of juror privacy.

a newspaper to determine if they pose a threat to fair trials. If the court believes that a prior article posed such a threat, it may then limit the press' access to the information that allowed the newspaper to write that article, although there is no evidence to suggest that any actual harm stemmed from its publication. It may thereby prevent any newspaper from printing any article using the forbidden information, regardless of the quality or beneficial effects of articles that might be written. I cannot sanction this form of judicial scrutiny. "'Regardless of how beneficient-sounding the purposes of controlling the press might be, we ... remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press.'" *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 560–61, 96 S.Ct. 2791, 2803–04, 49 L.Ed.2d 683 (1976) (quoting *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 259, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974) (White, J., concurring)).

## II

As the majority notes, the Supreme Court of the United States has recognized an implicit First Amendment right of access to the judicial process. While the right is a qualified one, the Supreme Court has been particularly solicitous to protect the public's right of access to criminal trials. In *Richmond Newspapers,* a majority of the Court found that the First Amendment demands that criminal trials be open, although no one opinion received a majority of the Court's votes. In *Globe Newspaper,* however, the Court overturned a state statute that allowed a trial judge to close a trial involving allegations of a sexual assault upon a minor. The Court reaffirmed its decision in *Richmond Newspapers* and held that a trial could be closed only if such a measure was necessitated by a compelling governmental interest. In *Press–Enterprise I,* the Court extended this rule to the selection of jurors, and in *Press–Enterprise II,* to pretrial hearings in criminal cases. More recently, several federal courts have determined that the First Amendment's protections extend to judicial

records. *See, e.g., In re Search Warrant for Secretarial Area Outside Office of Thomas Gunn,* 8th Cir., 855 F.2d 569 (1988) (documents filed in support of search warrant); *United States v. Smith,* 3d Cir., 776 F.2d 1104 (1985) (bill of particulars); *Associated Press v. United States District Court,* 9th Cir., 705 F.2d 1143 (1983) (general constitutional right of access to judicial records); *United States v. Dorfman,* 7th Cir., 690 F.2d 1230 (1982) (same). *But see Baltimore Sun Co. v. Goetz,* 4th Cir., 886 F.2d 60 (1989) (no right of access to affidavit in support of search warrant); *In re Reporters Comm. for Freedom of the Press,* D.C.Cir., 773 F.2d 1325 (1985) (no right of access to discovery documents in *civil* trial prior to entry of judgment).

The majority frames the issue in this case quite narrowly. The majority first attempts to classify access to jurors' names as access to either judicial records or judicial proceedings but ultimately declines to label the access that Gannett seeks. Thus, the majority analyzes the announcement of jurors' names as if the announcement, by itself, were a specific judicial proceeding from which the public was excluded. To determine whether this "proceeding" is presumptively open under the First Amendment, the majority applies the two-part test announced in *Press–Enterprise II:* (1) has "the place and process ... historically been open" and (2) does "public access play[ ] a significant positive role in the functioning of the particular process in question." *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. at 2740. By eschewing the "records" classification, the majority can avoid confronting the growing body of federal jurisprudence that protects access to judicial records in criminal cases. More important, by analyzing the announcement of names as if it were a distinct proceeding, the majority can separate the identity of the jurors from the jury selection process, ignoring the fact that eliciting and announcing the names of jurors is and always has been a part of *voir dire* in Delaware, throughout the nation, and since the birth of the jury system in England. In *Press–Enterprise I,* the Supreme Court held that

the jury selection process is presumptively open to public scrutiny. I find no basis for distinguishing juror identity from other aspects of juror selection. Accordingly, I believe that the Superior Court's order constituted a partial closure of *voir dire*, directly prohibited by *Press–Enterprise I*. Moreover, even if announcement is analyzed as if it were completely separate from jury selection, I believe that the twin considerations of "experience and logic" drawn from *Press–Enterprise II* require that the public be given access to jurors' names.

### A.

In *Press–Enterprise I*, the Supreme Court examined the constitutionality of an order that had excluded the public from all but three days of a six-week *voir dire*. The subsequent trial involved charges of rape and murder, and the trial judge justified his action on the ground that sensitive, personal information would be solicited from jurors during *voir dire*. He hoped to protect the privacy of jurors and to promote candor in an effort to protect the defendant's fair trial rights. However, the Supreme Court found that juror selection is presumptively an open process and that access is protected by the First Amendment. "[P]ublic proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by *jurors fairly and openly selected*." *Press–Enterprise I*, 464 U.S. at 509, 104 S.Ct. at 823 (emphasis added).

The majority contends that jurors were openly selected because "[t]he judicial proceedings, including *voir dire*, were never closed to the public." *Ante*, at 741. It is true that the public was never excluded from the courtroom. But the issue does not turn on logistics. The primary concern of *Press–Enterprise I* and related cases is minimizing secrecy in criminal proceedings. Anonymity is the very essence of secrecy. Thus, while there is a difference in degree between a court order that keeps jurors anonymous and an order that closes *voir dire* altogether, both orders prevent the public from receiving information that they otherwise would have received. Both alter the normal course of events in a way that restricts public access to the jury selection process.

The majority also notes that no provision of law dictates what information must be announced at trial or in the jury selection process; therefore, "[w]hen authorized by statute, or in order to protect a defendant's right to a fair trial, courts may withhold disclosure of certain information without depriving the public of its right to open courts." *Ante*, at 740. When carried to its logical extreme, this statement eviscerates the holding of *Press–Enterprise I*. It is true that potential jurors need not discuss every possible detail of their lives during *voir dire;* for example, the public has no possible interest in knowing whether jurors sitting in a personal injury case support the death penalty. The public does have a right to know information about jurors that is generated in the normal course of jury selection unless a restriction is necessary to preserve a compelling interest. That is the holding of *Press–Enterprise I*. Thus, for example, the public does have a right to know the jurors' views on the death penalty in a capital murder case.

The identity of each juror is the first piece of information generated in the selection process. In the usual course of events, each juror will answer to his name as his examination begins and the names of impanelled jurors will be announced as they are sworn. In the *Pennell* trial, however, this information was generated in secret and provided only to counsel. Apparently, the majority believes that the simple expedient of eliciting information about jurors in secret divorces it from the *voir dire* and allows it to be withheld from the public. Under this reasoning, a state might pass a statute providing that jurors' views on the death penalty could be kept confidential "in the interest of justice." The trial judge could question the jurors on their views and provide this information to counsel. He could then assert that *voir dire* was open because all other information was elicited in public; however, the

statute gave him discretion to "withhold disclosure of certain information."

Nothing in the majority's opinion would prevent the public or press from suing to gain access to the restricted information, but under the majority's reasoning it would be futile to allege simply that *voir dire* had been partially closed. Rather, the party seeking access would have to invoke *Press–Enterprise II.* He would have to prove that jurors' views on the death penalty had traditionally been public and that publicizing their views was beneficial to the trial process; in short, he would be asked to show that access was supported by "experience and logic." He might well be successful in proving this, but he should not be put to the task. *Press–Enterprise I* held that the jury selection process is presumptively open. I see no grounds for determining that only certain aspects of that process must be open, while others may be closed at the whim of the trial judge. The majority's reasoning turns *Press–Enterprise I* on its head: rather than forcing the court to show that a given restriction on access to *voir dire* is necessary, the majority would force the party seeking access to prove that access is necessary.

It is true that limiting the public's access to jurors' names is less restrictive than a complete closure of *voir dire.* Nevertheless, the Court in *Press–Enterprise I* strongly suggested that no limits should be imposed unless necessitated by compelling circumstances. In short, even if protecting juror anonymity is only the first step toward complete closure, it is a significant step nevertheless. The Court held that an individual juror might assert a privacy interest that would allow restrictions upon public access to sensitive areas of questioning. The trial court could then hold the *voir dire* of *that juror in camera,* but the transcript of the questioning would be made available at a later date. However, under some circumstances, "a valid privacy right may rise to a level that part of the transcript should be sealed, or the name of the juror withheld, to protect the person from embarrassment." *Press–Enterprise I,* 464 U.S. at 512, 104 S.Ct. at 825. In his concurrence, Justice Marshall elaborated:

"[T]he constitutionally preferable method for reconciling the First Amendment interests of the public and the press with the legitimate privacy interests of jurors and the interests of defendants in fair trials is to redact transcripts in such a way as to preserve the anonymity of jurors while disclosing the substance of their responses." *Id.* at 520, 104 S.Ct. at 829 (Marshall, J., concurring in the judgment). In other words, if a constitutionally compelling issue of privacy or fairness is present, a juror's name may be kept confidential. Otherwise, the *voir dire* should be free of restrictions upon public access.

## B.

Even if one follows the majority's lead and separates the identity of jurors from *voir dire,* I believe that the twin considerations of "experience and logic" set forth in *Press–Enterprise II* support a right of public access. The reasons for looking to historical practice are twofold. First, a tradition of openness at English common law provides evidence of the practices in use at the time that the First Amendment was adopted. *Richmond Newspapers,* 448 U.S. at 589, 100 S.Ct. at 2834 (Brennan, J., concurring in the judgment) ("[T]he Constitution carries the gloss of history."). Second, "a tradition of accessibility implies the favorable judgment of experience." *Id.*

The early jury of feudal society was, of course, a very different institution from the modern jury. Jurors were selected not because they were ignorant of the facts in dispute but because they were familiar with them. 1 W. Holdsworth, *A History of English Law* 332–33 (2d ed. 1922). The jurors were to serve as witnesses, as judges of the credibility of their acquaintances, and as final arbiters of the dispute. Since they were drawn from the landowners living *"de vicineto"* or in the immediate vicinity, their identity was certain to be known to those attending the trial. *See* Pope, *The Jury,* 39 Texas L.Rev. 426, 437 (1961). *See also In re Baltimore Sun Co.,* 4th Cir., 841 F.2d 74, 75 (1988). As the role of the jurors changed from witnesses of fact to judges of fact, prospective jurors

could be challenged for personal knowledge of the matter to be tried. Nevertheless, the jurors were drawn *"de corpore comitatus"*—from the county in which the dispute arose. 3 W. Blackstone, *Commentaries on the Laws of England* 359–60 (Sharswood ed. 1882) (1769). This practice continues in present-day America, although population growth and a vast expansion of the pool of eligible jurors make it unlikely that the identity of modern jurors will be apparent to the public unless their names are revealed.

In the sixteenth century, at a time when many of the concepts that underlie the modern jury had been crystalized, *see* Pope, *supra*, at 434–44, the names of jurors were announced in the selection process. Sir Thomas Smith, writing in 1565, describes the selection of jurors in vivid detail. "The clarke ... nameth all these that be on the quest [the jury]. The crier at everie name cryeth aloude ... and then saith good men and true...." T. Smith, *De Republica Anglorum* 99 (L. Alston ed. 1906 & photo. reprint 1979) (1585). *See also* M. Hale, *The History of the Common Law of England* 162 (C. Gray ed. 1971) (1713) ("When the Jurors appear, and are called, each Party has Liberty to take his Challenge....") The announcement of the names is connected not only to *voir dire*, but also to the oaths that the jurors take; thus, it played a

role in fixing a sense of responsibility to the crown and the accused upon the jurors.[3]

The early English practice was still in use on the eve of the American Revolution, as demonstrated by a passage from Blackstone's *Commentaries:*

> A common jury is one returned by the sheriff according to the direction of the statute 3 Geo. II. c. 25 ... and when each cause is called, twelve of the persons, whose names shall first be drawn out of the box, shall be sworn upon the jury, unless absent, challenged, or excused....
>
> As the jurors appear, when called, they shall be sworn, unless *challenged* by either party. 3 W. Blackstone, *supra*, at 358 (emphasis in original).[4]

Blackstone also describes how, if a sufficient number of satisfactory jurors could not be drawn from those summoned, the judge could order that the balance be filled from a so-called *tales de circumstantibus*, drawn from spectators present in the court. 3 W. Blackstone, *supra*, at 364–65. It seems unlikely that the identity of these jurors could be kept secret from the remaining spectators, even if the court had wished to impanel an anonymous jury.

The practice of publicly naming jurors continued in the American colonies and in

---

**3.** The names of jurors were public at William Penn's trial in 1670 for inciting an unlawful assembly. For a summary of Penn's account of the trial, *see* W. Forsyth, *A History of Trial by Jury* 337–44 (2d ed. 1878). The jury persisted in finding Penn guilty of no crime, despite the judge's insistence that Penn was guilty. "'Here some of the jury seemed to buckle to the questions of the court; upon which Bushel, Hammond, and some others, opposed themselves, and said they allowed of no such word as an unlawful assembly in their verdict....'" *Id.* at 340. Finally, "[t]he court ... commanded that every juror should distinctly answer to his name, and give in his separate verdict, which they unanimously did, saying, Not guilty 'to the great satisfaction of the assembly.'" *Id.* at 343. Jurors' names were also public at the 1735 trial of John Peter Zenger in the colony of New York. J. Alexander, *A Brief History of the Case and Trial of John Peter Zenger* 57–58 (S. Katz ed. 1963).

**4.** The majority apparently believes that this passage provides no evidence of the state of the

common law.at the time of the Revolution because the jury was impanelled under a statutory provision (*i.e.,* 3 Geo. II, c. 25). This is simply incorrect. English law, whether judge-made or statutory, became the common law of the American colonies when they declared their independence. *Manoukian v. Tomasian,* 237 F.2d 211 (1956), *cert. denied,* 352 U.S. 1026, 77 S.Ct. 588, 1 L.Ed.2d 596 (1957). Thus, the statute of which Blackstone writes was as much a part of American common law as, for example, the Statute of Frauds (29 Car. II, c. 3 (1677)).

The relevance of examining English law lies in determining the background against which the Bill of Rights was enacted. The Supreme Court has found that the framers of the First Amendment wished to preserve the tradition of openness that the English had enjoyed. *Richmond Newspapers,* 448 U.S. at 589–90, 100 S.Ct. at 2834–35 (Brennan, J., concurring in the judgment). The historical record demonstrates that. public knowledge of the identity of jurors was a part of this tradition.

the new American nation. At the highly publicized treason trial of Aaron Burr, the names of jurors were public, notwithstanding the defense's argument that unfavorable publicity had colored popular opinion against Burr to such an extent that an unbiased panel could not be selected. *United States v. Burr*, C.C.D.Va., 25 F.Cas. 55 (No. 14,693) (1807). The reported case provides a detailed description of the *voir dire*, which was presided over by Chief Justice Marshall and conducted before "[a]n immense concourse of citizens." *Id.* at 74. "At the instance of Mr. Hay [the prosecuting attorney] the names of the jurors were called, when forty-six answered to their names, two only being absent." *Id.* The prospective jurors were then called one by one and questioned extensively on their opinions and the role that the newspapers had played in shaping them. When only four satisfactory jurors could be drawn from the first venire, a second group of potential jurors was summoned and "called, and all except seven answered to their names." *Id.* at 85. Finally, after a *voir dire* lasting several days, twelve satisfactory jurors were chosen and sworn.

> The names of the selected jurors and of the venire were then called over. After which, John M. Sheppard, and Richard Curd were selected to complete the panel, and sworn. The following is, therefore, a complete list of the petit jury: [twelve names]. *Id.* at 87.

In sum, there is a considerable body of historical evidence to suggest that jurors' names were presumptively public both under English law and in the early days of the American nation.[5] Indeed, neither the majority nor the State cites a single example of a case tried before the 1970s in which an anonymous jury was impanelled. Most of the recent cases involve trials of organized crime figures in which a concern for the safety of jurors was present. *See, e.g., United States v. Tutino*, 2d Cir., 883 F.2d 1125 (1989); *United States v. Scarfo*, 3d Cir., 850 F.2d 1015 (1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 263, 102 L.Ed.2d

251 (1988); *United States v. Barnes*, 2d Cir., 604 F.2d 121 (1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Others involved a defendant's demands for a closed *voir dire* and did not address the First Amendment, *United States v. Layton*, N.D.Cal., 519 F.Supp. 959 (1981), or denied access on mootness grounds. *Hearst Corp. v. Maryland*, 60 Md.App. 651, 484 A.2d 292 (1984). Others involved situations in which names had been called in open court but access to files was denied. *Newsday, Inc. v. Sise*, 17 N.Y.2d 146, 524 N.Y.S.2d 35, 518 N.E.2d 930 (1987), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988); *United States v. Gurney*, 5th Cir., 558 F.2d 1202 (1977). Thus, the only precedential basis for the majority's ruling that I am able to discern is *United States v. Edwards*, 5th Cir., 823 F.2d 111 (1987), *cert. denied sub nom. Times Picayune Publishing Corp. v. Edwards*, 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988) and *United States v. Doherty*, D.Mass., 675 F.Supp. 719 (1987). Even these cases recognized that the First Amendment has some bearing on access to jurors' names but held that certain limits were acceptable under the circumstances.

One cannot conclude with certainty that in the entire history of Anglo–American jurisprudence an anonymous jury was *never* impanelled prior to the 1970s. Yet the majority appears to demand that degree of certainty before it would be willing to recognize a tradition of openness. Rather than requiring Gannett to show that a strong presumption of openness exists, the majority would ask it to prove that restrictions have never and could never have been imposed. By contrast, the United States Supreme Court has never required such an impossible standard of proof. In *Press–Enterprise II*, the Court recognized that a number of state statutes enacted in the 19th century had allowed preliminary hearings to be closed to the public. However, it found that these statutes fit within the broad tradition of openness because hear-

---

5. The Fourth Circuit found a strong tradition of openness in *In re Baltimore Sun Co.*, 841 F.2d 74 (1988), although it granted access to jurors' names on common law rather than First Amendment grounds.

ings could be "closed only for cause shown." *Press–Enterprise II,* 478 U.S. at 11, 106 S.Ct. at 2742.

Contrary to the majority's claims, a tradition of openness is reflected in currently enacted statutes. In fourteen states, statutes give the public access to master jury lists.[6] In eighteen states, statutes serve to create a presumption of public access to the names of qualified jurors or the jurors to be called for a venire.[7] Moreover, these statutes address only the procedures for revealing juror lists prior to impanelling. Research reveals no statute that alters the common law practice of naming jurors in open court during *voir dire,* and ten states have codified this practice.[8]

Nevertheless, the majority relies upon one federal and eleven state statutes to demonstrate that trial judges enjoy discretion to deny access to jurors' names. First, it should be pointed out that a statute enacted against a common law tradition of openness does not necessarily abolish that tradition. In *Richmond Newspapers, Globe Newspaper,* and *Press–Enterprise II,* the Supreme Court found a constitutional right of access notwithstanding the existence of statutes that purported to allow closure. Thus, if jurors' names have almost always been public and if the right of access plays a role in the judicial system, the right of access could not be altered by statute.

Moreover, I believe that the statutes cited by the majority fit within a tradition of openness. The statutes suggest that jurors'' names should be public in the vast majority of cases; they create a *presumption* of openness. However, the trial judge may keep information about jurors confidential or limit its use "in the interest of justice." Uniform Jury Selection and Service Act, 13 U.L.A. 437, 454–55 (West 1986). In short, the statutes give the trial judge a measure of *discretion.* However, the term "discretion," standing alone, is meaningless. Courts must often draw upon sources other than a bare statute to determine the scope of discretion and the standards under which it is exercised. *See United States v. Criden,* 3d Cir., 648 F.2d 814, 817–19 (1981); Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above,* 22 Syracuse L.Rev. 635, 636–43 (1971). Thus, constitutional principles may shape and channel the exercise of discretion. The statutes upon which the majority relies purport to allow the use of information about jurors to be "limited in whole or in part." Yet the majority must concede that a court could not give full effect to this language without running afoul of the constitution. If a judge released jurors' names but issued an order barring their publication, he would be "limit[ing]" the "use" of the information. However, his order would also constitute a prior restraint, in direct contravention of the First Amendment. *Capital Cities Media, Inc. v. Toole,* 463 U.S. 1303, 103 S.Ct. 3524, 77 L.Ed.2d 1284 (Brennan, Circuit Justice 1983). Thus, the statutes cannot be viewed in isolation from the First Amendment.

**6.** Ala.Code § 12–16–57; Colo.Rev.Stat. § 13–71–106; Idaho Code § 2–206; Ind.Code Ann. § 33–4–5.5–7; Mass.Gen.Laws Ann. ch. 234, § 9; Mo.Rev.Stat. § 494.410; N.H.Rev.Stat. Ann. § 500–A:3; N.J.Stat.Ann. § 2A:70–3; N.C. Gen.Stat. § 9–4; N.D.Cent.Code § 27–09.1–05; 42 Pa.Cons.Stat.Ann. § 4521; Utah Code Ann. § 78–46–10; W.Va.Code § 52–1–5; Wis.Stat. Ann. § 756.04.

**7.** Ariz.Rev.Stat.Ann. § 21–312; Colo.Rev.Stat. § 13–71–110; 10 *Del.C.* § 4513; Haw.Rev.Stat. § 612–15; Idaho Code § 2–210; Ky.Rev.Stat. Ann. §§ 29A.060, 29A.070; Me.Rev.Stat.Ann. tit. 14, § 1254–A; Md.Cts. & Jud.Proc.Code Ann. § 8–202; Mass.Gen.Laws Ann. ch. 234, § 18; Minn.Stat.Ann. § 593.42; Miss.Code Ann. § 13–5–32; Mont.Code Ann. § 3–15–503; N.J.

Stat.Ann. § 2A:71–2; N.M.Stat.Ann. § 38–5–11; N.D.Cent.Code § 27–09.1–09; 42 Pa.Cons.Stat. Ann. § 4522; Utah Code Ann. § 78–46–13; W.Va.Code § 52–1–9.

**8.** Ala.Code § 12–16–74; Ariz.Rev.Stat.Ann. § 21–325; Idaho R.Civ.Proc. 47(e); Mont.Code Ann. § 3–15–507; N.M.Stat.Ann. § 38–5–13; Okla.Stat.Ann. tit. 22, § 594; 42 Pa.Cons.Stat. Ann. § 4524; Tenn.Code Ann. § 22–2–306; Texas Crim.Proc.Code Ann. § 35.01; Wyo.Stat. § 1–11–116.

Two states, Indiana and Nebraska, have statutes that strictly control access to jurors' names. However, it is not clear that the control extends to revealing names during *voir dire* and impanelling. Ind.Code Ann. § 33–4–5.5–12; Neb. Rev.Stat. § 25–1635.

There are, of course, numerous instances in which "the interests of justice" might demand that public access be limited. Jurors' names could be withheld to protect jurors from the discussion of highly sensitive personal information. *See Press–Enterprise I,* 464 U.S. at 511–13, 104 S.Ct. at 824–26. They could be withheld where there was evidence that jurors might be injured, threatened, or bribed. Thus, there is some scope for the discretion that the majority relies upon. However, in light of the strong tradition of openness that may be drawn from the historical record, and in light of the inherent value of openness that the Supreme Court has recognized, I believe that this discretion cannot be exercised in isolation from constitutional principles.

### C.

In determining whether the public enjoys a right of access to a particular judicial proceeding, the Supreme Court has looked not only to history, but also to the structural role that access plays in the process being considered. The issue is "whether public access plays a significant positive role in the functioning of the particular process in question." *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. at 2740. While this "logic" consideration is a distinct prong of the test announced in *Press–Enterprise II* and applied by the majority in this case, the Supreme Court has noted that "experience and logic" are complementary considerations, "for history and experience shape the functioning of governmental processes." *Id.* at 9, 106 S.Ct. at 2740. *See also Richmond Newspapers,* 448 U.S. at 589, 100 S.Ct. at 2834 ("[A] tradition of accessibility implies the favorable judgment of experience.") (Brennan, J., concurring in the judgment). Thus, in many instances a process that historically has been open has been open for good reason. In citing "a classic example" of a proceeding that fails the "logic" test, the Supreme Court has

pointed to the grand jury system. *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. at 2740. Not coincidentally, the grand jury system has never been open to the public.

This is not to suggest that a given proceeding could not fail one of the tests in *Press–Enterprise II* but pass the other. For example, many aspects of a civil trial are often held in public, but since the concerns of the general public are implicated less directly there than in a criminal proceeding, the logic test might not support a right of access. *See generally In re Reporters Comm. for Freedom of the Press,* D.C.Cir., 773 F.2d 1325, 1336 (1985) (right of access to civil discovery document supported by neither experience nor logic). By contrast, it could be argued that if access would play a significant positive role, it should be allowed regardless of tradition. *See In re Reporters Comm.,* 773 F.2d at 1347 (Wright, J., concurring in part and dissenting in part). Nevertheless, I believe that the core concern of the logic test is to insure that the press cannot force access to those "kinds of government operations that would be totally frustrated if conducted openly." *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. at 2740. By contrast, the majority treats the logic test as the means to prevent " 'trivial and unimportant historical practices' " from becoming " 'chiselled in constitutional stone.' " *Ante,* at 749 (quoting *In re Reporters Comm.,* 773 F.2d at 1332). As examples of such trivial practices, the majority points to the reading of judgments aloud in open court and the tradition of impanelling a twelve-person jury. Such practices, while perhaps mere historical accidents, do not implicate the First Amendment; they present "no question of a truncated flow of information to the public." *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609, 98 S.Ct. 1306, 1318, 55 L.Ed.2d 570 (1978). Thus, they provide no help in determining the conditions under which access "plays a significant positive role." [9] In situations in which the "flow of

---

9. The majority supplies two distinct formulations of the "logic" test, using them interchangeably. Initially, the majority asks "whether public access to jurors' names plays a *significant positive role.*" *Ante,* at 749 (emphasis in original). In the next sentence, the majority asserts that " 'the historical practice [must] play[ ] *an essential role*" in the proper functioning of government.' " *Id.* (emphasis added) (quoting *In re Reporters Comm.,* 773 F.2d at 1332). *In re*

information" is involved, however, the critical inquiry is whether the judicial system functions better if that information is released or is kept secret.

The Supreme Court has stressed repeatedly that openness in the criminal justice system has a special value. Openness, and the publicity it invites, serves at least two distinct functions; it "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press–Enterprise I*, 464 U.S. at 508, 104 S.Ct. at 823. First, openness promotes fairness by providing a check on the arbitrary exercise of power. "The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587, 96 S.Ct. 2791, 2816, 49 L.Ed.2d 683 (1976) (Brennan, J., concurring in the judgment). Thus, openness "gives assurance that established procedures are being followed and that deviations will become known." *Press–Enterprise I*, 464 U.S. at 508, 104 S.Ct. at 823. Openness also promotes fairness by encouraging accurate testimony. *Richmond Newspapers*, 448 U.S. at 596–97, 100 S.Ct. at 2838–39 (Brennan, J., concurring in the judgment). Second, openness enhances the appearance of fairness by involving the public in the judicial process, providing certainty that justice is being done. As Chief Justice Burger explained:

> [O]penness has what is sometimes described as a "community therapeutic value." Criminal acts, especially violent crimes, often provoke public concern, even outrage and hostility; this in turn generates a community urge to retaliate and desire to have justice done.... When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions. Proceedings held in secret would deny this outlet and frustrate the broad public interest; by contrast, public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected.

*Press–Enterprise I*, 464 U.S. at 508–09, 104 S.Ct. at 823 (citations omitted).

I believe that both of these goals—promoting fairness and the appearance of fairness—are impaired when jurors are cloaked by a veil of anonymity. To understand the value of openness in this context, it is important to analyze the role of the jury within our judicial and political system. By examining the nature of the jury as an institution, one comes to understand that it is fundamentally a *public* institution, and that anonymity serves to impair both the jury's sense of responsibility to the public and the public's faith in the jury.

Although its roots stretch back to the Middle Ages, the American jury is profoundly democratic. *See Ballard v. United States*, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946). *See also* 1 A. de Tocqueville, *Democracy in America* 285–91 (H. Reeve tr.1900) (1st Am. ed. 1840). Jury service is the primary means by which the people participate in the judicial branch of government.[10] The jury serves as the

Reporters Committee predates *Press–Enterprise II* by almost a year, so one must conclude that the quoted language constitutes an impermissibly strict version of the "logic" test. Nevertheless, the majority decides that Gannett fails the logic test because "[i]t strains credulity to suggest that such an announcement was essential to the proper functioning of the trial." *Ante,* at 751. Obviously, there is a marked difference between a "significant positive role" and "an essential role." It also strains credulity to believe that the entire judicial system would come tumbling down if an occasional trial or *voir dire* were closed under the conditions faced by the

trial courts in *Globe Newspaper* and *Press–Enterprise I.* Nevertheless, the Supreme Court has found that openness itself plays a "significant positive role" in these situations, and that it should not be overridden without a finding of compelling need.

10. Indeed, Thomas Jefferson viewed jury service as the most important means by which the people participate in *government.* "Were I called upon to decide, whether the people had best be omitted in the legislative or judiciary department, I would say it is better to leave them out of the legislative. The execution of the laws is more important than the making

representative of the people, to insure that justice conforms to the sensibilities of the community and "to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975). Too often, however, jury service is seen as an arduous duty rather than a precious right.

Our courts have gone to great pains to insure that juries are drawn from a representative cross section of the community. *See, e.g., Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Carter v. Jury Comm'n of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *Ballard v. United States,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946); *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880). The importance of insuring that juries are drawn from a representative pool is twofold. First, the democratic nature of the jury protects the defendant. "The very idea of a jury is a body ... composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." *Strauder v. West Virginia,* 100 U.S. at 308. The representative character of the jury insures that the defendant will be judged by the standards of society rather than the biases of distinct groups. *Taylor v. Louisiana,* 419 U.S. at 530, 95 S.Ct. at 697. Second, drawing jurors from the broad spectrum of society protects the interest of each citizen in participating in government. *Carter v. Jury Comm'n of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *O'Hair v. White,* 5th Cir., 675 F.2d 680 (1982).

If groups such as women or racial minorities are excluded from service, " '[s]uch action is operative to destroy the basic democracy and classlessness of jury personnel.' " *Ballard v. United States,* 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946) (quoting *United States v. Roemig,* N.D. Iowa, 52 F.Supp. 857, 862 (1943)). "The injury is not limited to the defendant— there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of the courts." *Id.*

In *Democracy in America,* Alexis de Tocqueville discussed the value of the American jury as a political institution; his observations have lost none of their cogency in a century and a half. He argued that the people's participation in the judicial system strengthens their ability to participate in all forms of government, schooling them in the value of law and reminding them of their rights and responsibilities within society.

> The jury ... serves to communicate the spirit of the judges to the minds of all the citizens; and this spirit, with the habits which attend it, is the soundest preparation for free institutions. It imbues all classes with a respect for the thing judged, and with the notion of right.... The jury teaches every man not to recoil before the responsibility of his own actions, and impresses him with that manly confidence without which political virtue cannot exist. It invests each citizen with a kind of magistracy, it makes them all feel the duties which they are bound to discharge towards society, and the part which they take in the Government. By obliging men to turn their attention to affairs which are not exclusively their own, it rubs off that individual egotism which is the rust of society....

Thus the jury, which is the most energetic means of making the people rule, is also the most efficacious means of teach-

---

them." Letter from Thomas Jefferson to L'Abbé Arnoud (July 19, 1789), *reprinted in* 7 T. Jefferson, *The Writings of Thomas Jefferson* 423 (A. Lipscomb & A. Bergh eds. 1905). Jefferson added, "However, it is best to have the people in all the three departments, where that is possible." *Id.*

ing it to rule well. 1 A. de Tocqueville, *supra,* at 289, 291.

The jury represents the public, bringing the public's values and common sense to bear upon the problems of justice. In turn, the institution of the jury educates the public and heightens the civic awareness of each citizen.

If jurors are cloaked in anonymity, the bond between the jury and the public is weakened. While the juror cannot (and should not) be held responsible for his actions in the same way as a prosecutor or other elected official, it is equally important that he experience a keen sense of responsibility to the public whom he serves. Unless each juror knows that his identity is public knowledge, he may never properly appreciate the significance of the power that society has entrusted to him. An anonymous juror may feel that he has been called upon to serve as a fungible cog in the judicial apparatus, to render a verdict that draws meaning only from its enforcement by the state. By contrast, the juror whose identity is public knows that the verdict that he and his fellows render is a piece of handiwork to which their names are attached. This knowledge can only heighten the juror's inner sense of duty, teaching him "not to recoil before the responsibility of his own actions." 1 A. de Tocqueville, *supra,* at 289. While the announcement of jurors' names does not hold jurors up to the "public scrutiny and criticism" to which publicity subjects "the police, prosecutors, and judicial processes," it nevertheless "guards against the miscarriage of justice" by instilling the sense of personal responsibility that is so vital to the integrity of the jury system.[11] *Cf. Nebraska Press Ass'n,* 427 U.S. at 587, 96

S.Ct. at 2816 (Brennan, J., concurring in the judgment).

Announcing jurors' names also plays a role in encouraging truthful *voir dire* testimony and uncovering juror bias. Justice Brennan has suggested that if trials are closed, witnesses may be tempted to lie, secure in the knowledge that their testimony will never leave the courtroom. *Richmond Newspapers,* 448 U.S. at 596–97, 100 S.Ct. at 2838 (Brennan, J., concurring in the judgment). The interest of the courts in encouraging truthful *voir dire* testimony of jurors is just as strong as their interest in promoting accurate testimony by witnesses. In this regard, anonymity poses the same danger as complete closure because the anonymous witness or juror knows that his name cannot be attached to his testimony. In a similar vein, if a juror *does* lie or fail to disclose relevant information during *voir dire,* the truth may be discovered only if a member of the public comes forward to challenge the fitness of the juror. The majority rejects these arguments out of hand, asserting that they are "based on the presumption that jurors will not respond truthfully." *Ante,* at 750. The majority argues that *voir dire* questioning is wholly adequate to uncover bias, and that to suggest otherwise is "to adopt ... a cynical view of the criminal justice system." *Id.* I do not wish to overestimate the empirical significance of the public's role in uncovering juror bias. Examples of the public coming forward to question juror qualifications are rare, but do exist.[12] *See, e.g.,* MacKenzie, *Study Raises Questions About Mitchell–Stans Juror,* Wash. Post, Feb. 5, 1976, at A–2, col. 1 (assistant U.S. attorney challenged impartiality of juror after reading his name in the newspaper). Nevertheless, I am troubled by the majority's insistence that the public should rely

**11.** The majority suggests that Gannett has no standing to assert that openness improves the fairness of the judicial system. "Gannett's argument, that announcement of jurors' names promotes fairness, confuses the defendant's rights under the sixth amendment with the public's rights under the first amendment." *Ante,* at 750. This assertion is puzzling, since the belief that openness enhances fairness is drawn from the Supreme Court's First Amendment jurisprudence.

**12.** Moreover, the Supreme Court has recognized the role of openness in allowing the public to contradict the testimony of witnesses. *See Richmond Newspapers,* 448 U.S. at 570 & n. 8, 100 S.Ct. at 2823 & n. 8; *Gannett Co. v. DePasquale,* 443 U.S. 368, 383, 99 S.Ct. 2898, 2907, 61 L.Ed.2d 608 (1979).

upon the courts and counsel to insure that the process is working properly. The majority cannot believe that jurors never lie about their qualifications or that *voir dire* will *always* uncover partiality. Yet they are willing to deny the public *any* role in providing a check on bias. The public can, of course, learn that *Pennell* Juror No. 103 made certain statements, but no one can evaluate the veracity of these statements without knowing who made them. If the public must rely upon the courts and counsel to insure that jurors are unbiased, I see no reason why it should not also be forced to rely upon the courts and counsel to safeguard all aspects of a fair trial. Yet the Supreme Court has made it clear that the public has a right to oversee the criminal process, to help insure that it is functioning properly. I see no basis for diluting that right in the area of juror selection.

Because anonymity threatens the jury's sense of duty, it must also undermine the public's faith in the jury. Quite apart from the fact that anonymous juries weaken the public's ability to monitor jury selection, there is something inherently suspect about power that is held in anonymous hands. In contrast, announcing the jurors' names reminds members of the public that the jurors are truly the representatives of the community—their "neighbors, fellows, [and] associates." *Strauder v. West Virginia*, 100 U.S. at 308. It demonstrates, as no other measure can, that the jurors are ordinary citizens—not lawyers, not unelected officeholders, and not nameless faces. When the public observes an anonymous jury, it may be tempted to believe that the administration of justice is someone else's concern or that it is entrusted into the hands of judges and lawyers alone.

The majority condemns Gannett's arguments in favor of the value of openness as "pietistic." *Ante*, at 751. Perhaps they are. However, I cannot fault a vigorous effort to insure that the processes of the courts are fully open to the observation of the people and that the vital bond between the public and the jury is not weakened.

## III

Having established that Gannett enjoys a qualified First Amendment right of access to jurors' names, it remains to complete the final step of the analysis under *Press-Enterprise II*—the balancing of that right against the perceived threat to Pennell's Sixth Amendment right to a fair trial. The majority declined to enter that realm because it believed Gannett to have failed the threshold test. But because the trial judge completed the circle it is of more than academic interest that the test be fully applied.

When First Amendment rights, qualified or not, are at stake, our standard of review must be quite searching. "Where ... the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling government interest, and is narrowly tailored to serve that interest." *Globe Newspaper*, 457 U.S. at 606–07, 102 S.Ct. at 2619–20. Before entering a restrictive order, the trial court must conduct a hearing on the issue and articulate specific findings to support the order. *Press-Enterprise II*, 478 U.S. at 13–14, 106 S.Ct. at 2742–43. "If the interest asserted is the right of the accused to a fair trial," the court must find "that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Id.* at 14, 106 S.Ct. at 2743.[13]

---

**13.** The majority concedes that the trial court applied the wrong standard in evaluating the threat to the defendant's fair trial rights. Assuming *arguendo* that Gannett had a right of access, the trial court found that there was a "reasonable probability or reasonable likelihood" of harm, expressly rejecting *Press-Enter-* *prise II's* higher standard. *State v. Pennell*, Del. Super., Cr.A. Nos. IN88–12–0051 to –0053, Gebelein, J. (Oct. 2, 1989) (ORDER). Had the majority of this Court found that a First Amendment right existed, the application of this flawed standard alone would have merited reversal. I also question the trial court's decision to hold a

All would acknowledge that the fair trial rights of a defendant in a criminal case constitute a compelling interest that might justify limitations on First Amendment rights under certain circumstances. *Id. But cf. Nebraska Press Ass'n,* 427 U.S. at 611–12, 96 S.Ct. at 2828 (Brennan, J., concurring in the judgment) (no inherent conflict between First and Sixth Amendments). Under limited circumstances, the right of jurors to privacy might also justify limits on public access. *Press–Enterprise I,* 464 U.S. at 511–13, 104 S.Ct. at 824–26. However, the record is devoid of evidence that would suggest a substantial probability of a threat to either of these interests.

In *Press–Enterprise I,* the Court shed light on the conditions under which concerns of juror privacy might justify restrictions on access to *voir dire.* The Court stressed that the right of privacy belongs to the juror and must be asserted by him if it is to be recognized.[14] Moreover, it is implicated only when the questions asked at *voir dire* probe into sensitive details of a juror's life. Therefore, the Court suggested that the trial judge advise jurors if sensitive questions are likely to be asked and give them the option of requesting that measures be taken to eliminate any possible embarrassment. In his concurrence, Justice Blackmun stressed that the Court did not, and had never, found that jurors have a broad privacy right in their role as jurors. "Despite the fact that a juror does not put himself voluntarily into the public eye, a trial is a public event." *Press–En-terprise I,* 464 U.S. at 514 n. 1, 104 S.Ct. at 826 n. 1 (Blackmun, J., concurring). Thus, while a prospective juror has an interest in sheltering embarrassing personal information from public knowledge, he has no interest in preventing the public from knowing that he has been called to perform his civic duty by serving on a jury, however lurid the details of the trial that he will observe.[15] *A fortiori,* a trial judge acting on his own initiative has no interest in keeping this information from the public.

As previously noted, Gannett's conduct in the *Lynch* trial is central to the trial judge's finding of need for closure, as well as the majority's upholding of that result on different grounds. The majority seems to conclude that Gannett would have published a similar article about the *Pennell* jurors and that members of the community would then attempt to influence the jury. This conclusion requires a tremendous jump of logic. Although it is safe to assume that Gannett wished to publish the names of the *Pennell* jurors, there is no evidence on the record that suggests a substantial probability that jurors would be subjected to outside influences. After Gannett published the names of the *Lynch* jurors, no one attempted to contact the jurors and the trial concluded without any untoward incidents. Moreover, although the *Lynch* trial may have been the first Delaware trial in which a newspaper published jurors' names, the press in other states have often published the names of

---

hearing and provide the reasons for its Order after the restrictions on access had been imposed.

**14.** In this regard, the fact that all of the jurors in the *Pennell* trial stated that they would not object to having their names published is quite relevant. It may also explain why the majority did not rely upon juror privacy as a basis for restriction upon appeal.

**15.** Of course, if there were evidence that a defendant's associates might try to threaten or injure jurors, a compelling reason for anonymity would exist. *See, e.g., United States v. Scarfo,* 3d Cir., 850 F.2d 1015 (1988), *cert. denied,* — U.S. —, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *United States v. Barnes,* 2d Cir., 604

F.2d 121 (1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1988). However, the fact that anonymous juries have been impanelled despite Sixth Amendment objections raised by the defendant has little bearing on the question of whether jurors' names may be *routinely* withheld from the public. *Compare Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) *with Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (public has no Sixth Amendment right to attend trial, but does have a First Amendment right). Moreover, it should be stressed that neither the State, the trial judge, nor the majority has ever alleged that the safety of the *Pennell* jurors would be threatened by disclosure of their names.

jurors in celebrated cases.[16] Neither the State nor the majority has cited any case in which a mistrial was declared or a conviction overturned because members of the general public attempted to influence jurors.

In *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the local press went to great lengths to convince the public that a defendant charged with murder was guilty. A flood of extremely prejudicial and sensationalistic publicity preceded and continued throughout the defendant's trial. As a result, jurors were "exposed ... to expressions of opinion from both cranks and friends." *Id.* at 353, 86 S.Ct. at 1517. Finding that the defendant had not received a fair trial in "[t]he carnival atmosphere" that prevailed, *id.* at 358, 86 S.Ct. at 1520, the Supreme Court overturned his conviction. The Court suggested that the trial judge should have taken various steps to limit prejudice. Significantly, none of the suggested measures limited the public's right of access to the trial process; in particular, juror anonymity was never considered by the Court as a means of promoting a fair trial. Moreover, although the *Pennell* trial was attended by considerable publicity, there is no evidence, and it has not been suggested, that the press has engaged in the egregious attempt to prejudice public opinion that was present in *Sheppard.* Accordingly, I find no basis for concluding that Pennell's Sixth Amendment rights would have been jeopardized by the release of jurors' names.

### IV

The denial of access order issued by the trial judge was prompted by an understandable concern that the publicity attendant upon the *Pennell* trial, perhaps unprecedented in the history of this State, posed a threat to the court's ability to assure the defendant a fair trial. The use of an anonymous jury to accomplish that result, however, implicates the public's and the press' fundamental right of access to the trial process, which is assured by the First Amendment. Because the decision to impanel an anonymous jury was made contrary to precedential standards and without a balancing of competing constitutional rights, I consider it erroneous as a matter of law. Since the majority validates that result by its ruling, I must respectfully dissent.

---

16. *See, e.g.,* Pichirallo & Rezendes, *Jurors Found North Convincing,* Wash. Post, May 6, 1989, at A–1, col. 5 (trial of Oliver North); Richardson, *Hedgecock Jury Chosen Quickly,* San Diego Union, Nov. 29, 1984, at A–1, col. 1 (trial of mayor on conspiracy and perjury charges); Wicker, *Defense Questions Panel of 18,* Greensboro Record, July 3, 1980, at E–1 (trial of members of Ku Klux Klan on murder charges); Goshko, *Hearst Panel Largely Middle–Class,* Wash. Post, Feb. 5, 1976, at A–3, col. 1 (trial of Patricia Hearst).